We're ready whenever you're sure. Take your time. Please proceed whenever you're ready. Good morning, your honor. This is James Prosher for appellant. We believe, for at least two reasons that I'll discuss today, that the rejection of claims 1 through 28 is not proper and that we meet the substantial evidence standards in trying to establish that. The first reason, which the board has basically just ignored, the present invention, this invention, the use of fatty acid glycerides does more than just generate fatty acids. None of the references, incidentally it's a biodiesel fuel, none of the references consider that this other stuff could be present. The rejection is just streamline, you know, using the two references in a linear fashion that you're making what we call in the art of polyethoxylated fatty acid and that's it. We try to point out that there's more than that going on. So the board has just ignored it basically. The second point is this is a multi-step chemical process. Chemical processes usually are complicated. Two main references, Erner and Maurer, basically are two-step processes. So the board tries to, you know, refabricate those two references in coming up with our five-step process. Process that we sequentially make four intermediate reaction compositions and then finally extract the biodiesel fuel. So I think the way I'd like to go through the analysis, if I could direct your attention to the patent office's claim chart that they provided in their brief, which is on page 15. We'll sort of go through the steps involved. Well, I know time is short, but it seemed to me that what the board was particularly concerned about was the comparative data and that there was no explicit data showing that there was something significant about adding the epoxide in two steps rather than continuously as in the prior art. That part of the... Those statements have to do with unexpected results. Yes. That's not a point that we're going to emphasize today. But to answer your question, there is comparative data. I come from Detroit, so the auto business is what we do there. Those were done by a firm that does these kind of tests. They compared it to the fuel, which is the state-of-the-art, as they viewed it at the time the tests were done. And we found an advantage, something like one to four miles per gallon. Probably the most in the world, though. It doesn't sound like a very big number. But if you're in the auto industry, know that every incremental improvement is a big deal. It usually takes millions of dollars' worth of research. But that's really not the argument that I want to emphasize today. What I want to emphasize today is that we are making a different product. It is not the simple products of Erner and Maurer, which, again, are just polyethylated fatty acids. Ours is much more complicated. And it's much more complicated because we're starting out with fatty acid glycerides. So in their analysis, and I probably guided the examiner to his analysis somewhat inadvertently. But if we look at the claim chart, we're reacting a fatty acid glyceride-containing composition in a reaction promoter. So the office uses Erner and then take judicial notice of the fact that the hydrolysis of a tricalyceride produces a free fatty acid. I don't contest that. I mean, it would be sort of silly to because the only way you get free fatty acids is by hydrolyzing an oil, tricalyceride. I mean, there's no doubt, so I don't contest it. What I do contest is when you're trying to make the choice of let's use this as a starting material, tricalyceride, which is not a fatty acid. It has a part in there that can become a fatty acid, but it's not a fatty acid. Would one look at the primary references, Erner and Maurer, and say, yeah, let's use that. Now, patent office says, well, yeah, you'd make that determination because it's well-known, and it is, that you can hydrolyze tricalycerides to make a fatty acid. But they neglect the other part. They read out after that assertion, they read out the glyceride part. It has to be there. I mean, it didn't magically in the hydrolysis disappear. None of the references discuss that. So then the question becomes. I'm sorry, where is it that you're saying that reading out the glyceride? Well, I'm arguing that because they never consider while we try to point out to them that, you know, there's other stuff going on here, other moieties. But how are they reading it out? I'm sorry, I'm just not following. Could you explain how they're reading out the glyceride from the plant? Well, because they, when we try to point out, I mean, they're not literally saying we're not. I think their point is that one way to, instead of just starting with free fatty acids, one of ordinary scaly art would have been motivated to modify the reference to instead start with vegetable oil and include the process of separating out the free fatty acids. So how are they then, how does that translate into ignoring the limitations? So there's, I mean, I don't really think that was quite the rejection. Okay. I mean, I think it's a little different. You know, when the examiner made the rejection, it was Erner in view of Maurer. And then he, this was during the appeal and prosecution, then he makes this argument about, well, hydrolysis involves free radicals. He made it up. And, you know, I probably should have kept quiet, but I couldn't keep quiet about it, because it was just like fantasy. So I pointed out to him that it's not a radical reaction, it can't be. And then he, I said, you know, hydrolysis usually is acid or base catalyzed. So then he went back and found a reference, which I still think is constrained that in supercritical water you can have hydrogen and, you know, OH base ions generated. So I give him credit for doing that. I didn't think it was central to the getting this case allowed. Plus, we didn't want to amend the claims, which maybe would have been a logical way to proceed. We thought these claims were allowed for these two reasons. So we went on. So they use it as, all they use these references for is to take judicial, or sorry, official notice that water hydrolyzes triglycerides. We agree. But the point is, would you choose a triglyceride as your starting material for a biodiesel fuel when the reference, I mean, one skill in the art would say, well, yeah, okay, it can potentially generate fatty acids, but do we want that other junk around? I mean, it's really a contaminant from the perspective of Erner and Maurer. So, I mean, that's the issue. Is the argument that Erner and Maurer teach away from doing it? Well, all they talk about is central to those patents is that these are pure reactions. I mean, we can look at, I think, page six, column, well, if you want, I can cite to it. But I can tell you what they say. They really just talk about, and the primary reference, Erner in particular, doing this ethoxylation with a carboxylic acid, which can be derived from a fatty triglyceride. I mean, everybody knows that, so it's not controversial. That's the only way to get them. But they say use a triglyceride, and it's actually a very pure reaction. They don't use a solvent. It's sort of, you know, instructive, I think, that they don't use a solvent in that reaction. So the question is, now suddenly, if you use a triglyceride, you're injecting into that reaction, which they need this pure form to have an efficient biodiesel fuel, other compounds, the glyceride part, so to speak. So this is why I don't think it's obvious to do this. Why is it not obvious to do this? Because you get a very different product. You basically get a mixture of a bunch of stuff, which is what our invention is and what these two references do not teach. Those extra things that we're talking about in the claimed invention, they don't have any particular properties that help in, you know, how the biodiesel fuel works, right? That's not true. No? Okay. What are they? I mean, we didn't particularly make this argument. But in reality, they do. First of all, You did make this argument. I did not. But I can answer your question. Is it pointed out in the patent? I think it's inherent to the fact that these are organic molecules. So, you know, in first order, any organic molecules, fuel, to some extent, can burn it. And that's what fuels are. Carbon, hydrogen bonds, you burn it. It produces energy. So they have to affect the properties of it as a fuel. And also, the application does go into some discussion. Some of the claims are directed to properties such as viscosity, pore point, and stuff that I know less about. But these will be affected by what other stuff is in there. And in this analysis, you know, I put another key part of the analysis, which is in the claim chart provided by the office, Step C. We're now adding in to the second intermediate reaction mixture, a solvent, an additional reaction promoter. Now, we point out that the next step, we're going to add an epoxide. We point out that these are reactive conditions, especially a reaction promoter and an epoxide coming in. These are going to react. It's going to form something. And this is particularly true because, you know, the office is trying to make this analysis. This is a co-solvent such as water and a catalyst. So we're setting up reactive conditions. So when that epoxide goes in, it's going to react with the solvent that we added in the previous step. This also, you're getting more junk, so to speak. You don't have to be a chemist to understand this. This is going to be reflected in the final product. We're different. I mean, this seems to be an undesirable outcome for Erner and Maurer. For us, it's what we're doing. You're into your rebuttals, so why don't we hear from the government, if that's okay. Good morning. Good morning, Your Honors. May it please the Court. Here, substantial evidence supports the Board's finding that Representative Claim 1 is obvious in view of Erner and Maurer. Obviousness is a matter of law, so it's not substantial evidence. It's correctness. The ultimate finding of obviousness is a matter of law, but what a prior art reference teaches is a matter of fact, and those are reviewed for substantial evidence. But there's no dispute as to what's in the prior art dispute is whether it was obvious to combine these two references. That's correct. Rissio does not dispute the individual teachings of the prior art references. One of his primary disputes is whether or not there was motivation to combine the Erner reference and the Maurer reference. The Board found that the Erner reference is directed to reacting dicarboxylic acids with epoxides, including continuous addition of epoxides until a biofuel is formed. That's the Erner reference. The Maurer reference is directed to reacting monocarboxylic acids with epoxides, but also in the presence of solvents. And so because both the Erner reference and the Maurer reference are directed to combining similar reactants, as well as producing similar products, in both cases, hydroalkyl esters, the Board found that it would have been obvious for one of scale in the art to look at the teachings of Maurer to improve the reaction that's disclosed in Erner. But neither of those two references did make the combination or make the change. So how are we to have some sort of presumption, with hindsight, that it was obvious to put them together? Well, because the Erner reference is directed to using very similar reactants as the Maurer reference, and they both produce the same types of products here. There may be all the more reason to be suspicious if neither of those two inventors and two patents and two references did make this combination, this additional change that we're told in the record produced a superior product. I must say that my perception of what the Board came up with was their concern that the superiority had not been adequately demonstrated. Well, here the superiority had not been adequately demonstrated because the evidence that RISDO submitted before the Board was simply a chart showing the different properties of these various biodiesel fuels. But Claim 1 is directed to a method of producing this biofuel, and RISDO here did not disclose either method that was used for biodiesel 100 or biodiesel 99 in submitting that biodiesel 100 had superior characteristics. And therefore the Board found that it could not rely on that data because there is no indication on whether or not biodiesel 100 is commensurate in scope with Claim 1, or whether biodiesel 100 was compared to the closest prior to record, which in that case the Board found that it was Erner. Because Erner is also directed to starting with a fatty acid glyceride composition and then creating a biofuel to the addition of epoxides. Was there any reason to disbelieve the data, or just that there weren't enough details? There weren't enough details submitted here. Here when RISDO submitted the data, he did not provide any sort of 132 declaration indicating what method was used to formulate those biodiesel fuels. And because, again, the representative Claim 1 is directed to a method here, and what's important is whether or not that method was followed. And because the Board could not determine whether or not that method was followed here, it was impossible to look at the data and see whether or not it was actually showing unexpected results as compared to not only commensurate in scope with Claim 1, but also as compared to the closest prior to record, which here the Board found to be Erner. Yes, this is troubling because the Board left, at least for me, the clear impression that, but for their criticism of the data, the details, that this was an unexpected result, a significant improvement, something we know it's different from what the separate references do. And therefore, with hindsight, well, we'll put them together. The fact that you come up with something better, too bad you didn't convince us, not that you didn't convince us there was better, you just didn't fulfill the technicalities of putting in all of your data. I don't think the Board ever even disputed whether or not the Biodiesel 100 had better characteristics than Biodiesel 99. But there was a representation. There was no reason to disbelieve it. But there was also no representation that Biodiesel 100 was actually formulated using the method that's recited in Claim 1. And there was no, also there was no determination that Biodiesel 99 was used with any method that's either disclosed in Erner or disclosed otherwise. Mr. Riscio also never argued, or Riscio, sorry, never argued that Erner was not commercially available or should not be the closest prior to record. Those arguments were never raised before the Board. The other issue that Mr. Riscio relies on today is that the Board never started with a fatty acid glyceride containing composition. And that simply was not the issue that was before the Board. Before the Board, Mr. Riscio argued that the Claim 1 is not directed to combining dicarboxylic acids with epoxides. That was the focus of the argument before the Board. So that argument was never raised before the Board. But nevertheless, Erner discloses formulating a fuel through the epoxide addition of a free fatty acid that's derived from oil. And Riscio concedes that oil is a fatty acid glyceride containing composition. Are there any further questions? Thank you, Your Honors. I'm going to be out of my time. I need a minute. Sure. Thank you. Thank you. The Board just now alleges that the issue that the reactions were complicated, that there's other stuff going on, was not before the Board during the appeal process at the PTAB. So I would direct the Court's attention to page four of our brief. It's appendix page number 171. And somewhere you see the highlighted words before and after. Next sentence. At no point does the method of the present invention call for conditions that lead only to the formation of free carboxylic acids. So that's a statement that we're trying to convince the office that this reaction is more complicated than just something that produces only a fatty acid. And one other thing that maybe this is an important point, but the Board's representative sort of mixed up Maurer and Erner. Sort of every time I heard it, it bothered me. Maybe it's not important. But Erner is a monocarboxylic acid, which is more like part of what's going on in our invention. It's significant that it be a monocarboxylic acid because the long fatty chain has most of the energy content. Maurer is the dicarboxylic acid. So she mixed them up. And that reference isn't directed at all to a fuel. It's really for making monomers for polymeric process. I'm not arguing that, well, you know, I'm not emphasizing that they're unrelated art because one thing is one, the other. They teach what they teach. And, you know, any chemist will say, okay, this is what it says, so we have to deal with it. But the thing that the Board also brought up, well, before I get there, I'm a little uncomfortable with the emphasis on this unexpected results. That was only one of our arguments and probably, to me, the least compelling. And I pointed out our position. I mean, we make the representation that the data is our product. So, I mean, I'm essentially certifying that by submitting the briefs and everything else I did. I don't think it helps anymore to have somebody else say this is the method and it's our invention. So that's our assertion. But, again, I'm a little uncomfortable. I don't view this as the necessarily most important aspect of the invention that the Board should consider. However, another point, the Board says, well, you combine these references because then you have Maurer improving Erner. How does it improve Erner? What's the improvement? There's nothing in the briefs that discuss that. So I think that's all I have to say. Okay. Thank you. Thank you. We thank both sides and the case is submitted.